UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION
2017 DEC 11 PM 12: 13
SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. |
| | ) | |
| [UNDER SEAL], *et al.*, | ) | **1 17-cv- 4561 WTL -TAB** |
| | ) | |
| Defendants. | ) | |

## DOCUMENT FILED UNDER SEAL

United States Attorney's Office
10 W. Market, Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: 317-226-6333

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

2017 DEC 11 PM 12: 13

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. |
| | ) | |
| ZIAD I. KHADER, | ) | **UNDER SEAL** |
| NEIL H. PATEL, and | ) | |
| NIKHIL H. PATEL, | ) | **1  17**-cv- **4561** WTL -TAB |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' BRIEF IN SUPPORT OF EMERGENCY *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

The United States filed its Verified Complaint for Temporary Restraining Order and

Permanent Injunction, pursuant to 18 U.S.C. § 1345 and Local Rule 65.2. Through this motion,

the United States of America ("United States") seeks a temporary restraining order, preliminary

injunction, and other equitable relief in this matter to prevent further losses to the United States,

the State of Indiana, and the public. The Government has thus far identified losses to health care

benefit programs of over $9.3 Million stemming from a scheme implemented through a series of

false statements that allowed the defendants and their companies to qualify as a pharmacy

provider within the health care benefit programs and to bill and receive reimbursements for

prescriptions. As described herein and in the supporting documents, the defendants have

systematically dissipated the vast majority of the funds it has received by making electronic fund

transfers to other accounts controlled by the defendants, to accounts in family nominee names,

and to accounts in names of LLCs, as well as by investing in business ventures, sending money overseas, buying real estate, and buying luxury vehicles.

The United States moves on an emergency basis because, as explained below, the defendants are expected to be arrested in a criminal case sharing the same operative facts. *See United States v. Khader, et al.*, Cause No. 1:17-cr-0241-JMS-DML. On December 6, 2017, a grand jury in the Southern District of Indiana issued a sealed indictment against these three defendants for conspiracy to make false statements relating to a health care matter; conspiracy to commit money laundering; and money laundering. Arrest warrants were issued for all three defendants on the same day, and law enforcement agents are preparing to execute those warrants tomorrow morning. However, the temporary restraining order must be in place sufficiently before arrest to give time for the financial institutions to freeze defendants' accounts to prevent any further dissipation of assets – in particular, the alienation or disposition of property obtained as a result of the commission of a Federal health care offense or property of an equivalent value.

As the evidence obtained to date through the investigative efforts of law enforcement agents, including the Internal Revenue Service-Criminal Investigation, demonstrates, the defendants have committed Federal health care offenses and are dissipating proceeds of such fraud. The United States seeks injunctive relief under 18 U.S.C. § 1345 to: (1) enjoin defendants' fraudulent conduct, and (2) freeze defendants' assets–assets derived from the fraud or of a value up to the fraud proceeds–to preserve the status quo and ensure that sufficient assets are available to satisfy any judgment requiring restitution or forfeiture.

## SUMMARY OF THE EVIDENCE

The United States has gathered overwhelming evidence that defendants engaged in a widespread scheme, spanning multiple years, to submit false statements concerning their

company Nowscript to several companies commonly referred to as pharmacy benefit managers. *See generally* Declaration of Special Agent C. Michael Mannix as attached to the Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction ("Mannix Decl.").

The defendants, through Nowscript, distributed compounded medications all over the country, including Indiana, Florida, Georgia, Illinois, and Hawaii. Mannix Decl., ¶ 9. Compounding involves the preparation of medication by combining and mixing different types and dosages of ingredients to create a drug or medication tailored to the needs of an individual patient and for which there is no equivalent form commercially available. *Id.* Health care benefit programs, both commercial and federal, typically reimburse pharmacies for compounded medications prescribed and dispensed to their insureds, based on the amount and nature of the drugs contained in the compound. *Id.* They reimbursed Nowscript for up to $17,000 for one month's supply of a compounded medication for one patient. *Id.*

In order to receive those reimbursements, the defendants enrolled Nowscript with several companies commonly referred to as pharmacy benefit managers. These companies included AccessHealth,[1] a California corporation; CVS Caremark, also a California corporation; and Express Scripts, a Missouri corporation. *Id.* These three pharmacy benefit managers, among other things, screened and paid pharmacies on behalf of both commercial and federal health care benefit programs, including TRICARE, Federal Employee Program, Federal Employees Health, Government Employees Health Association, and many others. *Id.; see* 18 U.S.C. § 24 (defining "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any

---

[1] AccessHealth is a pharmacy services administrative organization, but provided the services discussed herein in the same manner as a pharmacy benefit manager. As a result, they are referred to as a pharmacy benefit manager throughout.

individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."). TRICARE provided civilian health benefits for military personnel, military retirees, and military dependents all around the world. *Id.*

AccessHealth, CVS Caremark, and Express Scripts required pharmacy providers, including Nowscript, to fill out provider certification or enrollment forms. Mannix Decl., ¶ 11. Those certifications and enrollment forms required Nowscript to provide basic information about the operation and ownership of the pharmacy, including the names of the owners, whether the pharmacy was a mail order or a retail pharmacy, whether the pharmacy used a sales force, and whether the pharmacy waived or offered reductions in copays. *Id.*

AccessHealth, CVS Caremark, and Express Scripts used these forms as the primary basis for allowing Nowscript to become a pharmacy provider within their networks. Mannix Decl. ¶ 12. Entry into these three pharmacy benefit manager networks allowed the defendants to bill and receive reimbursements for prescriptions provided from Nowscript to all of the networks' healthcare benefit programs' beneficiaries. *Id.*

In or around April 2014, defendant Ziad Khader signed and submitted a "Provider Certification" form for Nowscript to Express Scripts. Mannix Decl. ¶ 13. In or around May 2014, defendant Ziad Khader signed and submitted a "Provider Participation Enrollment Form" for Nowscript to AccessHealth. *Id.* In or around December 2014, defendant Ziad Khader signed and submitted a "Credentialing/Service Level Worksheet" for Nowscript to CVS Caremark. *Id.*

Based on the representations he made in these three documents, Express Scripts, AccessHealth, and CVS Caremark contracted with Nowscript to become a pharmacy provider within their networks. Mannix Decl. ¶ 14. These contracts allowed the defendants to bill the

health care benefit programs within each of the three networks for prescriptions that Nowscript filled and distributed. *Id.*

From about April 2014 through about August 2016, the defendants, Ziad Khader, Neil Patel, and Nikhil Patel, caused Nowscript to bill the health care benefit programs within these networks and receive the following reimbursements for compounded medications distributed to those beneficiaries:

- $3.86 million for compounded medications distributed to Express Script's network of health care benefit program beneficiaries;
- $4.78 million for compounded medications distributed to AccessHealth's network of health care benefit program beneficiaries; and
- $931,046 for compounded medications distributed to CVS Caremark's network of health care benefit program beneficiaries.

Mannix Decl., ¶ 15.

In all three documents, defendant Ziad Khader falsely stated that Nowscript was a retail, open-door community, walk-in pharmacy that did not do any mail-order business. Mannix Decl., ¶ 16. In fact, almost all of the prescriptions that Nowscript distributed were distributed via mail, outside of the State of Michigan where Nowscript was physically located. *Id.*

This false statement was material to the decisions Express Scripts, AccessHealth, and CVS Caremark made to allow Nowscript into their networks to receive insurance reimbursements for the compounded medications. Mannix Decl., ¶ 17. As defendant Neil Patel stated in a March 2015 text message to defendant Nikhill Patel, "[T]hey will take the contract away" if the pharmacy is shipping more than a certain percentage of its prescriptions. *Id.* Neil

Patel continued, "The[] only way they bust a pharmacy is if they do one of these big audits and see that over 75% is out of state." *Id.*

In addition, as defendant Nikhil Patel acknowledged in the same March 2015 text message string, doing business as a retail pharmacy instead of a mail order pharmacy was "[i]mpossible" without changing the location and business itself. Mannix Decl., ¶ 18. In the Express Scripts "Provider Certification" form, defendant Ziad Khader made several other material, false statements, including the following:

A.     Ziad Khader falsely stated that he, together with the wives of defendants Neil Patel and Nikhil Patel, were the only three owners of Nowscript. Mannix Decl., ¶ 19. In fact, defendant Ziah Khader owned the pharmacy together with defendants Neil Patel and Nikhil Patel (not their wives), as well as with a fourth owner, Owner A. *Id.*

B.     Ziad Khader falsely stated that no one with a "direct or indirect financial interest in the pharmacy" had "prescriptive authority." In fact, defendant Nikhil Patel was a part-owner of Nowscript and was a physician with prescriptive authority, licensed in Florida. *Id.*

C.     Ziad Khader falsely stated that Nowscript did not contract with or employ a "sales force." *Id.* In fact, Owner A was specifically responsible for marketing, sales, advertising, and promotion of Nowscript. *Id.* Owner A employed multiple people who visited physicians' offices to promote the compounded medications and pay the physicians for the compounded medication prescriptions. *Id.*

D.     Ziad Khader also falsely stated that Nowscript never waived or offered a reduction of the patient copayment (also known as copay) amounts. *Id.* In fact, Nowscript waived reductions of copays for multiple patients. *Id.* At the direction of the defendants, Nowscript employees even purchased gift cards in order to create records making it appear as if

6

patients had paid their copay with a Visa or Mastercard. *Id.* Nowscript patients would not have accepted the compounded medication if they had had to pay a copay, given the high cost of the drugs. *Id.*

Those false statements were material to the decision Express Scripts made to allow Nowscript into its network. Mannix Decl., ¶ 20. As defendant Neil Patel stated in a March 2016 text message, "If we tell the real owners we open ourselves to them trying to say that we committed fraud on the application." *Id.* As to Owner A specifically, defendant Ziad Khader was aware that there were potential issues regarding Owner A's payments to prescribers who prescribed the compounded medication prescriptions that Nowscript filled, as Ziad Khader indicated in a September 2014 text message to Nowscript's pharmacy manager: "[Owner A] pays doctors and that is a [Medicare/Medicaid] fraud if we fill any [Medicare/Medicaid]. *Id.*

In addition, the United States has gathered overwhelming evidence that from around August of 2014 to the present, the defendants have systematically dissipated the vast majority of the funds received from Express Scripts, AccessHealth, and CVS Caremark by making electronic funds transfers to other accounts controlled by the defendants, to accounts in family nominee names, and to accounts in names of LLCs, as well as investing in business ventures, sending money overseas, buying real estate, and buying luxury vehicles. Mannix Decl., ¶ 26.

From the time period beginning on or about June 24, 2014 and ending on or about July 19, 2016, Express Scripts, AccessHealth, and CVS Caremark deposited the following amounts into the following Nowscript bank accounts either by electronic funds transfer or checks deposited:

| Pharmacy Benefit Manager | Nowscript Bank Account | First Deposit Date | Last Deposit Date | Total Amount |
|---|---|---|---|---|
| AccessHealth | Chase X0522 | 6/24/2014 | 6/23/2015 | $3,020,314 |

| | | | | |
|---|---|---|---|---|
| AccessHealth | PNC X7766 | 6/25/2015 | 5/10/2016 | $1,622,639 |
| Express Scripts | Chase X0522 | 7/23/2014 | 7/24/2015 | $3,513,290 |
| Express Scripts | PNC X7766 | 7/23/2015 | 11/17/2015 | $222,319 |
| Express Scripts | Star X9105 | 5/16/2016 | 7/19/2016 | $70,063 |
| CVS Caremark | Chase X0522 | 5/5/2015 | 7/24/2015 | $579,877 |
| CVS Caremark | PNC X7766 | 8/3/2015 | 5/16/2016 | $351,877 |
| Total: | | | | $9,379,671 |

Mannix Decl., ¶ 21.

These deposits by Express Scripts, AccessHealth, and CVS Caremark were paid on claims submitted by Nowscript based upon the false statements on the enrollment forms. Mannix Decl., ¶ 22. In addition to these deposits, there were deposits from other health care benefit programs and pharmacy benefit managers, including but not limited to the U.S. Department of Labor, Argus Health Systems, Health E Systems, and TmeSys. *Id.*

These defendants used their shell company, PNK Services LLC, to transfer these monies to themselves. Mannix Decl., ¶ 23. They used bank accounts at various banks, including Start Financial X9083, in the name of this shell company. *Id.* They transferred approximately 55% of the net profits of Nowscript to three different bank accounts in the name of PNK Services LLC. *Id.* Neil Patel and Nikhil Patel placed their ownership of PNK Services LLC in their wives' names. *Id.*

For the time period of April 24, 2014 through February 28, 2017, PNK Services LLC received approximately $8,310,084. Mannix Decl., ¶ 24. Of that amount, $7,819,577 was deposited by Nowscript, of which 44% was from the entities who paid as a result of false statements and approximately 56% was from the U.S. Department of Labor. *Id.* During this

same time period, the defendants transferred or caused to be transferred $2,604,247 each to themselves or their nominees. *Id.* Of the $2,604,247 that each received, $1,719,606 was paid as a result of false statements. *Id.*

PNK Services LLC is a shell company with no expenses other than state taxes. Mannix Decl., ¶ 25. On a consistent basis, the defendants transferred or caused to be transferred money from Nowscript's bank accounts into PNK Services LLC's bank accounts. *Id.* In turn, and typically on the same day, the defendants then transferred or caused to be transferred one-third of that money from PNK Services LLC's bank accounts into each of the defendants' or their nominees' bank accounts. *Id.* For example, on August 8, 2014, the defendants transferred $660,000 from Nowscript to PNK Services LLC. *Id.* On the same date, the defendants, in three separate transactions, transferred $220,000 each from PNK Services to accounts in each of their control. *Id.*

### Defendant ZIAD KHADER

Ziad Khader deposited $2,396,843 into his Chase X9239 account from PNK Services LLC during the time period of August 8, 2014 through April 25, 2016. Mannix Decl., ¶ 27. Ziad Khader then commingled the money from PNK Services LLC with funds from other pharmacies for which Ziad Khader owned. *Id.*

The following payments or electronic fund transfers occurred from Ziad Khader's Chase X9239 on the following dates:

| Beginning Date | Ending Date | Entity | Amount |
|---|---|---|---|
| 10/03/2014 | 05/21/2015 | A&Z Cars | $117,220 |
| 01/15/2015 | 04/21/2015 | JDZK | $160,000 |
| 05/22/2015 | N/A | Joe Property Investment | $100,000 |
| 04/21/2015 | N/A | Keystone Car Wash | $75,000 |
| 05/13/2015 | 05/21/2015 | Middle Eastern Dining | $150,000 |
| 08/08/2014 | 05/29/2015 | ZIAD KHADER Chase X6230 | $937,069 |
| 07/14/2014 | 11/05/2014 | ZIAD KHADER Chase X7973 | $5,732,000 |

| | | | |
|---|---|---|---|
| 10/14/2014 | N/A | Purchase Property 2945 West State Road 32, Westfield, IN. | $102,865 |

Mannix Decl., ¶ 28.

A&Z Cars is a used car dealership in which Ziad Khader has an ownership share. Mannix Decl., ¶ 29. JDZK and Joe Property Investment are both LLCs in which Ziad Khader has an ownership share. *Id.* Keystone Car Wash is a car wash business in which Ziad Khader has an ownership share. *Id.* Middle Eastern Dining is a restaurant of which Ziad Khader has sole ownership. *Id.*

The following payments or electronic fund transfers occurred from Ziad Khader's Chase X7973 on the following dates:

| Date | Entity | Amount |
|---|---|---|
| 11/14/2014 | Purchase property 823 West State Route 32, Westfield, IN. | $443,998 |
| 2/27/2015 | ZIAD KHADER Chase Brokerage X2002 | $250,000 |
| 2/27/2015 | ZIAD KHADER Chase Brokerage X9008 | $250,000 |
| 5/29/2015 | ZIAD KHADER Chase X6230 | $1,995,169 |

Mannix Decl, ¶ 30.

On May 29, 2015, Ziad Khader did an electronic funds transfer of $2,854,498 from his Chase X6230 account to a PNC X5946 account in Ziad Khader's name. Mannix Decl., ¶ 31.

The following payments or electronic fund transfers occurred from Ziad Khader's PNC X5946 on the following dates:

| Beginning Date | Ending Date | Entity | Amount |
|---|---|---|---|
| 06/22/2015 | N/A | Purchase of 613 N. John Daly, Dearborn Heights, MI. | $180,770 |
| 07/27/2015 | 02/03/2016 | Casablanca LLC | $170,000 |
| 09/17/2015 | | Eyad Khader | $100,000 |
| 06/01/2015 | 05/05/2016 | Middle Eastern Dining | $72,000 |
| 06/11/2015 | N/A | Foreign Exchange | $500,000 |
| 07/09/2015 | 05/31/2016 | ZIAD KHADER Fifth Third X2013 | $1,650,153 |

Mannix Decl., ¶ 32.

Casablanca LLC is another restaurant in which Ziad Khader has an ownership share.

Mannix Decl., ¶ 33. Eyad Khader is Ziad Khader's brother. *Id.* The foreign exchange

transaction is Ziad Khader sending money overseas. *Id.*

On June 10, 2016, Ziad Khader did an electronic funds transfer of $1,712,821 from his

Fifth Third X2013 to a Fifth Third X9992 account in Ziad Khader's name. Mannix Decl., ¶ 34.

Ziad Khader received $25,404 from PNK from July 19, 2016 to December 19, 2016. *Id.*

The following payments or electronic fund transfers occurred from Ziad Khader's Fifth

Third X9992 on the following dates:

| Date | Entity | Amount |
|------|--------|--------|
| 10/14/2016 | A & Z Group Inc. Old National X7140 | $200,000 |
| 02/17/2017 | A.K. Revocable Trust Huntington Bank X3092 | $250,000 |
| 02/17/2017 | A.K. #2 Revocable Trust Huntington Bank X3115 | $250,000 |
| 02/17/2017 | L.K. Revocable Trust Huntington Bank X3089 | $250,000 |
| 2/24/2017 | A&Z Group Inc. Old National X4644 | $1,000,000 |

Mannix Decl., ¶ 35.

A.K., A.K. #2, and L.K. are Ziad Khader's minor children. Mannix Decl., ¶ 36.

On February 27, 2017, A&Z Group Inc. Old National X4644 transferred $1,000,000 to

an Old National account X5618 owned by Ziad Khader. Mannix Decl., ¶ 37.

As of the following dates the following accounts have the following balances:

| Date | Account | Amount |
|------|---------|--------|
| 10/31/2017 | ZIAD KHADER Old National X5618 | $951,174 |
| 11/13/2017 | A.K. Revocable Trust Huntington Bank X3092 | $249,502 |
| 11/13/2017 | A.K. #2 Revocable Trust Huntington Bank X3115 | $249,502 |
| 11/13/2017 | L.K. Revocable Trust Huntington Bank X3089 | $249,502 |

Mannix Decl., ¶ 38.

Ziad Khader still owns the properties located at 823 West State Road 32, Westfield,

Indiana and 2945 West State Road 32, Westfield, Indiana. Mannix Decl., ¶ 39.

*Defendant NEIL PATEL*

Neil Patel deposited $2,139,843 into his Chase X7530 account from PNK Services for the time period of August 8, 2014 through May 20, 2015. Mannix Decl., ¶ 40. Neil Patel then commingled the funds from PNK Services LLC with funds from his other compounding pharmacies. *Id.*

The following payments or electronic funds transfers occurred from Neil Patel's Chase X7530 on the following dates:

| Beginning Date | Ending Date | Entity | Amount |
|---|---|---|---|
| 8/14/2014 | 5/29/2015 | NEIL PATEL JPM X5380 | $5,087,044 |
| 8/15/2014 | N/A | Pharma Botanical | $241,000 |
| 8/25/2014 | 1/28/2015 | Targa Holdings | $215,000 |
| 5/29/2015 | N/A | NEIL PATEL PNC X0656 | $265,000 |

Mannix Decl., ¶ 41.

The following payments or electronic fund transfers occurred from Neil Patel's Chase X5380 on the following dates:

| Date | Entity | Amount |
|---|---|---|
| 08/14/2014 | Pharma Botanical | $241,000 |
| 04/16/2015 | NEIL PATEL PNC X0656 | $1,700,000 |

Mannix Decl., ¶ 42.

Pharma Botanical is an LLC owned by Neil Patel and Nikhil Patel. Mannix Decl., ¶ 43.

Neil Patel deposited $439,000 into his PNC X0656 account from PNK Services for the time period of June 30, 2015 through April 25, 2016. Mannix Decl., ¶ 44. The following

payments or electronic fund transfers occurred from Neil Patel's PNC X0656 on the following

dates:

| Beginning Date | Ending Date | Entity | Amount |
|---|---|---|---|
| 06/16/2015 | 05/18/2016 | NEIL PATEL PNC X3474 | $3,821,433 |
| 10/14/2015 | 11/24/2015 | Targa Holdings PNC 7889 | $207,500 |

*Id.*

    Targa Holdings is an LLC of which Neil Patel has sole ownership. Mannix Decl., ¶ 45.

    The following payments or electronic fund transfers occurred from Neil Patel's PNC

X3474 on the following dates:

| Date | Entity | Amount |
|---|---|---|
| 10/23/2015 | Provident Funding LP | $286,309 |
| 12/28/2015 | E.P. PNC X0787 | $28,000 |
| 12/28/2015 | A.P. PNC X0779 | $28,000 |
| 05/05/2016 | NEIL PATEL First Internet X5989 | $500,000 |
| 05/05/2016 | E.P. First Internet X5997 | $250,000 |
| 05/05/2016 | E.P. First Internet X6010 | $250,000 |
| 05/05/2016 | A.P. First Internet X6002 | $250,000 |
| 05/05/2016il | A.P. First Internet X6028 | $250,000 |
| 05/09/2016 | NEIL PATEL Ally Bank X1295 | $500,000 |
| 05/09/2016 | E.P. Ally Bank X1493 | $250,000 |
| 05/09/2016 | A.P. Ally Bank X1592 | $250,000 |
| 05/20/2016 | Barclays X1925 (Unknown) | $250,000 |
| 05/20/2016 | Barclays X2008 (Unknown) | $250,000 |
| 05/20/2016 | Barclays X1952 (Unknown) | $250,000 |
| 05/26/2016 | A.P. Huntington X9007 | $358,994 |

Mannix Decl., ¶ 46.

    A.P. and E.P. are Neil Patel's minor children. Mannix Decl., ¶ 47. On January 30, 2017,

Neil Patel completed an electronic funds transfer to TD Ameritrade X4007 in the name of Neil

Patel of $66,000. *Id.* Provident Funding LP is a financial institution that specializes in

mortgages. *Id.* Neil Patel has no ownership in Provident Funding LP. *Id.*

    As of the following dates the following accounts have the following balances:

| Date | Account | Amount |
|---|---|---|

| 08/31/2017 | NEIL PATEL First Internet X5989 | $500,480 |
| 08/31/2017 | E.P. First Internet X5997 | $250,246 |
| 08/31/2017 | E.P. First Internet X6010 | $250,246 |
| 08/31/2017 | A.P. First Internet X6002 | $250,246 |
| 08/31/2017 | A.P. First Internet X6028 | $250,246 |
| 10/27/2017 | NEIL PATEL Ally Bank X1295 | $505,687 |
| 10/27/2017 | E.P. Ally Bank X1493 | $253,665 |
| 10/27/2017 | A.P. Ally Bank X1592 | $253,655 |
| 10/27/2017 | A.P. Huntington X9007 | $123,774 |
| 10/23/2017 | NEIL PATEL TD Ameritrade X4007 | $146,511 |

Mannix Decl., ¶ 48.

### Defendant NIKHIL PATEL

Nikhil Patel deposited $745,600 into his Chase X5685 account from PNK Services for the time period of August 8, 2014 through September 16, 2014. Mannix Decl., ¶ 49. Nikhil Patel then commingled the funds from PNK Services LLC with funds from his other compounding pharmacies. *Id.*

The following payments or electronic fund transfers occurred from Nikhil Patel's Chase X5685 on the following dates:

| Date | Entity | Amount |
| --- | --- | --- |
| 08/12/2014 | Pharma Botanical | $361,000 |
| 09/16/2014 | NIKHIL PATEL Chase X8135 | $650,244 |
| 09/05/2014 | NIKHIL PATEL H&W X1103 | $27,157 |

Mannix Decl., ¶ 50.

Nikhil Patel deposited $1,394,243 into his Chase X8135 account from PNK Services for the time period of September 24, 2014 through May 20, 2015. Mannix Decl., ¶ 51. Nikhil Patel then commingled the funds from PNK Services LLC with funds from his other compounding pharmacies. *Id.*

The following payments or electronic fund transfers occurred from Nikhil Patel's Chase X8135 on the following dates:

14

| Beginning Date | Ending Date | Entity | Amount |
|---|---|---|---|
| 10/17/2014 | N/A | Purchase of 54 Sandpiper Road, Tampa, FL | $707,115 |
| 10/06/2014 | 05/21/2015 | Javic Properties LLC | $183,682 |
| 10/31/2014 | 01/09/2015 | NIKHIL PATEL PNC X7282 | $4,000,000 |
| 12/03/014 | N/A | NIKHIL PATEL H&W X1103 | $1,000,000 |
| 04/02/2015 | N/A | NIKHIL PATEL PNC X0998 | $1,000,000 |
| 03/12/2015 | N/A | Precision Labs | $76,000 |
| 03/23/2015 | 06/01/2015 | NIKHIL PATEL Goldman Sachs X4905 | $999,710 |
| 05/26/2015 | N/A | CSZ Enterprises | $65,000 |

Mannix Decl., ¶ 52.

Javic Properties is a Tampa, Florida residential home builder. Mannix Decl., ¶ 53.

Precision Labs and CSZ Enterprises are LLCs in which Nikhil Patel has an ownership share. *Id.*

Precision Labs and CSZ Enterprises each have Ziad Khader as the registered agent and the

business address of each business is Ziad Khader's home address. *Id.*

The following payments or electronic fund transfers occurred from Nikhil Patel's PNC

X7282 on the following dates:

| Date | Entity | Amount |
|---|---|---|
| 08/22/2014 | NIKHIL PATEL Chase X5685 | $1,000,000 |
| 02/03/2015 | NIKHIL PATEL PNC 0998 | $5,686,423 |

Mannix Decl., ¶ 54.

The following payments or electronic fund transfers occurred from Nikhil Patel's PNC

X0998 on the following dates:

| Beginning Date | Ending Date | Entity | Amount |
|---|---|---|---|
| 04/03/2015 | 05/26/2015 | NIKHIL PATEL PNC X1456 | $2,475,000 |
| 05/14/2015 | N/A | Phone Transfer (Unknown location) | $300,000 |
| 11/23/2015 | N/A | NIKHIL PATEL PNC X9848 | $65,507 |
| 04/06/2015 | N/A | Transfer to unknown trust | $251,000 |

Mannix Decl., ¶ 55.

Nikhil Patel deposited $309,000 into his PNC X1456 account from PNK Services for the

time period of June 30, 2015 through December 1, 2015. Mannix Decl., ¶ 56. Nikhil Patel then

commingled the funds from PNK Services LLC with funds from his other compounding pharmacies. *Id.*

The following payments or electronic fund transfers occurred from Nikhil Patel's PNC X1456 on the following dates:

| Beginning Date | Ending Date | Entity | Amount |
|---|---|---|---|
| 05/15/2015 | N/A | NIKHIL PATEL Goldman Sachs X4905 | $1,000,000 |
| 07/22/2015 | 05/18/2016 | NIKHIL PATEL PNC X9848 | $3,258,149 |

Mannix Decl., ¶ 57.

Nikhil Patel deposited $130,000 into his PNC X9848 account from PNK Services for the time period of January 13, 2016 through April 25, 2016. Mannix Decl., ¶ 58. Nikhil Patel then commingled the funds from PNK Services LLC with funds from his other compounding pharmacies. *Id.*

The following payments or electronic fund transfers occurred from Nikhil Patel's PNC X9848 on the following dates:

| Beginning Date | Ending Date | Entity | Amount |
|---|---|---|---|
| 09/16/2015 | 02/26/2016 | Hive LLC | $93,226 |
| 09/02/2015 | 03/30/2016 | Javic Properties LLC | $1,017,274 |
| 09/28/2015 | 05/11/2016 | NIKHIL PATEL PNC X1456 | $1,050,000 |
| 10/23/2015 | N/A | Unknown Wire Out | $136,559 |
| 05/24/2016 | N/A | NIKHIL PATEL Goldman Sachs X4905 | $1,850,000 |

Mannix Decl., ¶ 59.

Hive LLC is a company in Tampa, Florida that installs "smart home" electronics. Mannix Decl., ¶ 60.

The following payments or electronic fund transfers occurred from Nikhil Patel's Goldman Sachs X4905 on the following dates:

| Beginning Date | Entity | | Amount |
|---|---|---|---|

| 03/25/2015 | NIKHIL PATEL Goldman Sachs X6231 | $250,000 |
| 06/3/2015 | NIKHIL PATEL Goldman Sachs X0753 | $588,000 |
| 09/27/2016 | NIKHIL PATEL Huntington X7720 | $1,999,000 |

Mannix Decl., ¶ 61.

Nikhil Patel made an electronic funds transfer of $1,996,390 from his Huntington X7720

account to a Bank of Tampa X6020 in Nikhil Patel's name on December 30, 2016. Mannix

Decl., ¶ 62.

On February 3, 2017, Nikhil Patel made an electronic funds transfer of $1,800,000 from

his Bank of Tampa X6020 to his Goldman Sachs X4905 account. Mannix Decl., ¶ 63.

The following payments or electronic fund transfers occurred from Nikhil Patel's H&W

X1103 on the following dates:

| Beginning Date | Ending Date | Entity | Amount |
| --- | --- | --- | --- |
| 12/04/2014 | N/A | NIKHIL PATEL H&W X5401 | $500,000 |
| 05/03/2016 | 04/07/2017 | NIKHIL PATEL Bank of Tampa X6020 | $66,318 |

Mannix Decl., ¶ 64.

As of the following dates the following accounts have the following balances:

| Date | Account | Amount |
| --- | --- | --- |
| 10/31/2017 | NIKHIL PATEL H&W X1103 | $1,543,182 |
| 10/31/2017 | NIKHIL PATEL H&W X5401 | $261,785 |
| 10/20/2017 | NIKHIL PATEL Bank of Tampa X6020 | $177,814 |
| 10/26/2017 | NIKHIL PATEL Goldman Sachs X4905 | $1,893,641 |
| 10/26/2017 | NIKHIL PATEL Goldman Sachs X6231 | $297,993 |
| 10/26/2017 | NIKHIL PATEL Goldman Sachs X0753 | $605,650 |

Mannix Decl., ¶ 65.

Although the defendants have been paid through the health care benefit programs over $9

Million since at least March 2014, the United States has been able to locate assets totaling a

fraction of that amount. Defendants appear to have dissipated millions of dollars in funds, and

unless enjoined will continue to dissipate the proceeds of their health care fraud. Mannix Decl.,

¶ 21-65; *see also* Exhibits A, B, and C attached to Mannix Decl. for a summary of the movement

of assets for the defendants. Therefore, the United States seeks to restrain all assets of

defendants up to the amount of $9,379,671 (Mannix Decl., ¶ 15) that are proceeds or profits from

the defendants' health care offenses or property of an equivalent value of such proceeds or

profits.

## **ARGUMENT**

### **AN INJUNCTION IS APPROPRIATE TO ENJOIN THE COMMISSION OF A FEDERAL HEALTH CARE OFFENSE AND TO PRESERVE THE FRUITS OF THE DEFENDANTS' FRAUD**

**A.     The Fraud Injunction Statute**

The Fraud Injunction Statute, 18 U.S.C. § 1345, was originally enacted in 1984 as part of

the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2152 (1984).

Section 1345 was enacted "'to allow the Attorney General to put a speedy end to a fraud scheme

by seeking an injunction in federal district court' as soon as the requisite evidence is secured."

*United States v. American Heart Research Foundation, Inc.*, 996 F.2d 7, 11 (1st Cir. 1993)

(quoting S. Rep. 225, 98th Cong., 2d Sess. 402 (1984), reprinted in U.S. Code Cong. & Admin.

News 3182, 3549). "The legislative history shows that Congress authorized this expedited action

precisely because 'the investigation of fraudulent schemes often takes months, if not years,

before the case is ready for criminal prosecution' and in the meantime 'innocent people continue

to be victimized.'" *American Heart Research Foundation, Inc.*, 996 F.2d at 11 (quoting S. Rep.

225 at 401-02). "Regarding the authorization of prejudgment attachments, the legislative history

indicates that Congress intended to enhance the government's ability to enjoin the dissipation of

assets wrongfully obtained through fraud." *United States v. DBB, Inc.*, 180 F.3d 1277, 1283

(11th Cir. 1999) (citations omitted).

In 1996, Congress enacted the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191 (August 21, 1996) (the "1996 Act") which, *inter alia*, amended 18 U.S.C. § 1345 to specifically apply to Federal health care offenses. In relevant part, 18 U.S.C. § 1345 provides that:

(a)(1)  If a person is –

> (A)  violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title; .. . [or]

> (C)  committing or about to commit a Federal health care offense, the Attorney General may commence a civil action in any Federal court to enjoin such violation.

(2)  If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of . . . a Federal health care offense or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court –

> (A)  to enjoin such alienation or disposition of property; or

> (B)  for a restraining order to –

>> (i)  prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

>> (ii)  appoint a temporary receiver to administer such restraining order.

18 U.S.C. § 1345(a). The fraud injunction statute further states that the Court may take such other action as is warranted to prevent a continuing and substantial injury to the United States:

> (b) The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

18 U.S.C. § 1345(b).

A Federal health care offense is defined by Congress as:

"a violation of, or a criminal conspiracy to violate--

> (1) section 669, 1035, 1347, or 1518 of [Title 18];
>
> 2) section 287, 371, 664, 666, 1001, 1027, 1341, 1343, or 1954 of [Title 18], if the violation or conspiracy relates to a health care benefit program."

18 U.S.C. § 24(a). The term "health care benefit program" means "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). As discussed above, the pharmacy benefit managers or pharmacy services administrative organizations included AccessHealth, CVS Caremark, and Express Scripts, who among other things, screened and paid pharmacies on behalf of both commercial and federal health care benefit programs, including TRICARE, Federal Employee Program, Federal Employees Health, Government Employees Health Association, and many others. *See* Mannix Decl., ¶ 10.

## B. Standards for Issuance of Injunctive Relief

The traditional standards for the granting of injunctive relief by the district court requires a four-part analysis:

> The district court begins by considering whether the moving party had demonstrated: 1) a reasonable likelihood of success on the merits, and 2) no adequate remedy at law and irreparable harm if preliminary relief is denied. If the moving party clears these hurdles, the court must then consider: 3) the irreparable harm the non-moving will suffer is balanced against the irreparable harm the moving party will suffer if the injunction is denied, and 4) the public interest, *i.e.*, the effect that granting or denying the injunction will have on non-parties.

*Mil-Mar Shoe Co. Inc. v. Shona Corp.*, 75 F.3d 1153, 1156 (7th Cir. 1996) (citations omitted). *See Shango v. Jurich*, 681 F.2d 1091, 1096 (7th Cir. 1982) (to be entitled to injunctive relief, plaintiff must establish "reasonable probability of success on the merits, irreparable injury, the lack of serious adverse effects on others and sufficient public interest").

This traditional analysis applies to § 1345 injunctions "unless and until it proves fundamentally unworkable." *United States v. Fang*, 937 F. Supp. 1186, 1196 (D. Md. 1996). In *Fang*, the district court determined that the showing of the lack of an adequate remedy at law was outmoded, particularly in light of the existence of a statute providing for injunctive relief. *Fang*, 937 F. Supp. at 1196 (citations omitted). Similarly, the continued existence of the scheme to defraud is irreparable harm *per se* under section 1345. *United States v. Beldin*, 714 F. Supp. 42, 45 (N.D.N.Y. 1987); *Fang*, 937 F. Supp. at 1199 ("The theory is that by expressly making injunctive relief available in the criminal setting, Congress has already declared the fraudulent activity to be unlawful. For the same reason, once the undesirable conduct is established, it is fair to conclude that the public interest will be served if appropriate injunctive relief is granted.").

In order to demonstrate entitlement to injunctive relief under § 1345, the United States is required to show only that there is "probable cause" to believe that the defendants are committing or about to commit a Federal health care offense, including violations of 18 U.S.C. §§ 1341, 1347, 287, 371, and/or 1001. In *Fang*, 937 F. Supp. 1186, the district court undertook an analysis of the standards applicable to the granting of an injunction to enjoin a scheme to defraud under 18 U.S.C. § 1345, prior to its recent amendments. However, in undertaking its consideration of the matter, the *Fang* court specifically noted the changes made to the statute as a result of the 1996 Act. The analysis of the district court provides persuasive reasoning for the

application of the "probable cause" or "reasonable probability" standard of proof for the issuance

of an injunction against fraud.[2]

In considering the appropriate standard of proof, the *Fang* court noted that when the

meaning of "reasonable probability" used in conventional preliminary injunction analysis is

compared to the meaning of "probable cause," the results are similar. *Fang*, 937 F. Supp. at

1197. The district court also stated that "[a]s a matter of policy, if Congress contemplated a

'speedy' way to get at the fruits of ongoing or likely to reoccur fraud, all that would seem

necessary would be a strong albeit reasonable suspicion that the fraud is occurring or likely to

occur." *Fang*, 937 F. Supp. at 1197. The district court concluded that the traditional "reasonable

probability" standard equates with the "probable cause" standard which should be applied in a

§ 1345 action. *Fang*, 937 F. Supp. at 1197. *See also United States v. Belden*, 714 F. Supp 42, 45

(N.D.N.Y. 1987) (". . . it is unlikely that Congress intended to hold the government to a more

stringent standard than that of probable cause when relief under 1345 was sought, since 1345

was intended to make it easier for the government to obtain preliminary injunctions as a means

of terminating fraud schemes during the pendency of criminal investigations than had been

possible under 39 U.S.C. § 3007."); *United States v. Weingold*, 844 F. Supp 1560, 1571 (D.N.J.

1994) (holding probable cause to the "controlling substantive standard" and explaining that

probable cause requires the government to present "a set of facts that which would cause a

reasonably prudent and intelligent person to believe that a cause of action exists . . .").[3]

---

[2]Application of such a standard is entirely consistent with Seventh Circuit precedent
which has expressed the traditional injunction standard in terms of both "a reasonable likelihood
of success" and a "reasonable probability." *See Mil-Mar Shoe Co. Inc. v. Shona Corp.*, 75 F.3d
1153, 1156 (7th Cir. 1996); *Shango v. Jurich*, 681 F.2d 1091, 1096 (7th Cir. 1982).

[3]In *United States v. Brown*, 988 F.2d 658 (6th Cir. 1993), the inquiry of the Sixth Circuit
Court of Appeals was whether 18 U.S.C. § 1345, as amended in 1990, gave the district court

## C.     There is Probable Cause or a Reasonable Probability that the Defendants Have Committed a Health Care Fraud Offense

Applying these standards to the facts established through the investigation into the

defendants' business practices, the United States has established probable cause that a Federal

---

authority to freeze defendant's assets in an action not involving bank fraud.  In determining that the district court did have that power, the Sixth Circuit also determined that "preponderance of the evidence" standard applied in determining which assets were subject to being frozen under section 1345.  The court concluded the United States had the burden to demonstrate which funds were traceable to the fraud and determined that section 1345 actions are governed by the traditional burdens of proof in civil actions to avoid giving the government a substantial advantage over traditional civil plaintiffs that is not mandated by the language of section 1345. *Brown*, 988 F.2d at 663-664.  *Brown* does not stand for the proposition that the "preponderance of the evidence standard" applies in all phases of a section 1345 action.  The *Brown* decision undertook no analysis of the traditional standards for the granting of injunctive relief, which is a lesser standard than a preponderance of the evidence.  *See United States v. Quadro Corporation*, 996 F. Supp. 613 (E.D. Tex. 1996), *United States v. Quadro Corporation*, 928 F. Supp. 688 (E.D. Tex. 1996), and *United States v. Barnes*, 912 F. Supp. 1187 (N.D. Iowa 1996) which relied on *Brown* to apply the preponderance of the evidence standard.

The statutory scheme of 1345 authorizes the United States to seek injunctive relief pre-indictment and recognizes that the district court may be asked to act in the infancy of an investigation to protect the United States or the public.  Because of the strong Congressional purpose of providing the United States an expedited remedy to protect the public from ongoing fraud, the preponderance of the evidence standard would frustrate that purpose.

Moreover, the lower "probable cause" standard may actually be a more fair standard than the higher "preponderance of the evidence" standard when considering the defendant's interests.  If the United States proves, by a preponderance of the evidence, the commission of a Federal health care offense in support of its application for injunctive relief, such a judicial ruling could stand as collateral estoppel on the issue of the defendant's liability for violations of the civil False Claims Act, 31 U.S.C. §§ 2729-2733, or for an action for civil fraud, unjust enrichment, or payment by mistake.  This may be particularly so in a case where the underlying scheme to defraud, which may give rise to both civil and criminal liability.  A defendant's Fifth Amendment right to remain silent would allow a negative inference in the civil proceedings, and allow the United States a decided advantage in the litigation of any future action under the civil False Claims Act, particularly when the defendant may be called upon to defend the section 1345 action at the early stage of the criminal proceedings, pre-indictment.  While Congress intended the United States to have an advantage in regard to enjoining the commission of a Federal health care offense and the preservation of the defendant's assets for benefit of the victims of the fraud, such advantage does not extend to foreclosing the defendant from defending a civil fraud action on the merits should one be brought.  *See United States v. American Heart Research Foundation, Inc.*, 996 F.2d 7, 11-12 (1st Cir. 1993) (United States may litigate an injunction action under 18 U.S.C. § 1345 to final judgment and bring damage action as separate case).  Application of the probable cause standard effects the Congressional purposes of section 1345, while preserving the defendant's ability to defend a civil fraud action on the merits at a later date should the United States choose to bring one.

health care fraud offense has been or is being committed, causing irreparable injury, and that the balance of harm tips in favor of the United States, the State of Indiana, and the public. The issuance of a temporary restraining and a preliminary injunction enjoining the defendants from further fraud under 18 U.S.C. § 1345 is appropriate.

The United States has demonstrated that the defendants have submitted material false statements concerning Nowscript to include information concerning the ownership of the pharmacy, its operations, whether it used a sales force, and whether it waived or offered reductions in copays, all with the purpose of being enrolled as a pharmacy provider with pharmacy benefit manager networks so that they could bill and receive reimbursements for prescriptions to the networks' healthcare benefit programs' beneficiaries. As a result of this deceptive scheme, the defendants were able to obtain over $9 Million in reimbursements from April 2014 to August 2016. The preliminary findings for this period of time indicates that the defendants billed the health care benefit programs within the networks and received the following reimbursements for compounded medications distributed to those beneficiaries:

- $3.86 million for compounded medications distributed to Express Script's network of health care benefit program beneficiaries;

- $4.78 million for compounded medications distributed to AccessHealth's network of health care benefit program beneficiaries; and

- $931,046 for compounded medications distributed to CVS Caremark's network of health care benefit program beneficiaries.

Mannix Decl., ¶ 15.

The facts established by the Declaration of C. Michael Mannix, SA IRS-CI, provide both probable cause and a reasonable probability that the defendants have engaged in a scheme to

submit false statements so as to qualify for enrollment as a pharmacy provider in violation of Federal health care offense, as defined by 18 U.S.C. § 24(a), and by conspiring to make false statements relating to health care matters, in violation of 18 U.S.C. § 371.

Because the United States has established that the defendants are committing fraud and/or a Federal health care offense, the harm to the public is presumed, and the balance of harm tips in favor of the United States. As the *Fang* court concluded, "[t]o the extent that the [United States] can demonstrate a reasonable probability that criminally fraudulent activity has in fact occurred, one may fairly conclude that the hardships tip decidedly in favor of the [United States]." *Fang*, 937 F. Supp. at 1199. Injunctive relief under 18 U.S.C. § 1345 is appropriate.

## D. Funds or Property in an Equivalent Value to the Fraud are Subject to an Injunction Against Alienation or Disposition

In order to obtain injunctive relief against the transfer of the defendants' assets, the United States must show that they are "alienating or disposing of property obtained through, or traceable to, health care fraud." *DBB, Inc.*, 180 F.3d 1285-86. Once that showing is made, § 1345 provides:

> broad avenues of relief that complement each other and further congressional intent. Subsection (a)(2)(A) offers the government the ability to prevent the sale or other disposition of a particular piece of property that it has traced to fraud. Subsection (a)(2)(B), on the other hand, explicitly provides broader relief for situations where the property obtained through fraud is not as easily identified. It allows the government to prevent the withdrawing, transferring, removing, and dissipating of an amount of the defendant's assets equal to that obtained through fraud and to have a temporary receiver appointed to administer the assets until a final judgment is reached. In addition, the use of the phrase "any person" in subsection (a)(2)(B) appears to also authorize injunctions that prevent third parties from removing a defendant's assets.

*DBB, Inc.*, 180 F.3d at 1286.

The evidence presented by the United States demonstrates that the defendants have received over $9 Million as a direct result of their fraudulent scheme. Mannix Decl., ¶ 15.

Using a shell company, PNK Services LLC, that had no expenses, other than states taxes, the defendants on a consistent basis transferred or caused to be transferred money from Nowscript's bank accounts into PNK Services LLC's bank accounts. Mannix Decl., ¶ 24. In turn, and typically on the same day, the defendants then transferred or caused to be transferred one-third of that money from PNK Services LLC's bank accounts into each of the defendants' or their nominees' bank accounts. *Id.*

From around August 2014 to the present, as described above, the defendants have continued to systematically dissipate the vast majority of the funds received from Express Scripts, Access Health, and CVS Caremark by making electronic funds transfers to other accounts controlled by the defendants, to accounts in family nominee names, and to accounts in names of LLCs, as well as investing in business ventures, sending money overseas, buying real estate, and buying luxury vehicles. Mannix Decl., ¶ 25. There is no question that the defendants continue to dispose of or alienate their assets on a daily basis.[4]

The purpose of a § 1345 injunction is to preserve the fruits of a defendant's fraud for the benefit of those he has victimized. In light of the pervasiveness of the defendants' fraud, the liquidity of their financial holdings, and their ability to move large sums of money very quickly, relief under § 1345 is necessary to bring all of the defendants' financial holdings within the jurisdiction of the Court in order to properly preserve these assets for the benefit of their victims.

The defendants' fraudulent scheme to make false statements in relation to a health care matter establishes probable cause and a reasonable probability that they have violated 18 U.S.C.

---

[4] *Cf., Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 678 (1974) ("[P]reseizure notice and hearing might frustrate the interests served by the statutes, since the property seized--as here, a yacht--will often be of a sort that could be removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given).

¶ 371. Under these circumstances, the equivalent value of funds or property subject to an injunction equals the reimbursements paid to the defendants by AccessHealth, CVS Caremark, and Express Script—the sum of $9,379,671. Mannix Decl., ¶ 15. Since the scope of the fraud in this case is large, totaling more than $9 Million, and the injunction may freeze both traceable and non-traceable assets, the United States seeks an injunction to freeze all of the assets in which the defendants have an interest up to the equivalent value of the proceeds of the scheme to defraud.

WHEREFORE, the United States respectfully requests that the Court issue a temporary restraining order enjoining the alienation or disposition of all of defendants' assets pending a hearing and disposition of the request for the preliminary injunction as follows:

A. Issue a temporary restraining order and an injunction that orders that each of the defendants, his agents, servants, employees, attorneys, family members, and all persons acting in concert and participation with each of the defendants, including all corporations over which each defendant exercises any direct or indirect control, be enjoined as follows:

1) From making, or conspiring to make, any false statement in relation to a health care matter;

2) From withdrawing or transferring any moneys or sums presently deposited, or held on behalf of each of the defendants or their nominees' (including their minor children) by any financial institution, trust fund, or other financial agency, public or private, that are proceeds from false, fictitious, or fraudulent claims made by each of the defendants, or any moneys of an equivalent value to those taken through false, fictitious, or fraudulent claims, including but not limited to the following bank accounts:

| Bank | Account Name | Account # |
|------|--------------|-----------|
| Old National Bank | Ziad Khader | X5618 |

| Huntington National Bank | A.K. Revocable Trust | X3092- |
|---|---|---|
| Huntington National Bank | A.K. Revocable Trust | X3115- |
| Huntington National Bank | L.K. Revocable Trust | X3089- |
| First Internet Bank | Neil Patel | X5989 |
| First Internet Bank | Neil Patel POD E.P. | X5997 |
| First Internet Bank | Neil Patel POD A.P. | X6002 |
| Ally Bank | Neil and Christina Patel | X1295 |
| Ally Bank | E.P. (Neil Patel Custodian) | X1493 |
| Ally Bank | A.P. (Neil Patel Custodian) | X1592 |
| Bank of Tampa | Nikhil and Sarah Patel | X6020 |
| Goldman Sachs | Nikhil and Sarah Patel | X4905 |
| Star Financial Bank | Script LLC | X9105 |
| Star Financial Bank | PNK Services LLC | X9083 |

    3)       From transferring, selling, assigning, dissipating, concealing,

encumbering, impairing, or otherwise disposing of, in any manner, assets, real or personal,

including but not limited to the following:

| Owner | Description | Parcel/VIN # |
|---|---|---|
| Nikhil and Sarah Patel | 54 Sandpiper Road, Tampa, Florida, 33609 | A-19-29-18-3LE-000000-00001.1 |
| Ziad Khader | 823 West State Road 32, Westfield, Indiana 46074 | 29-09-03-000-005.000-015 |
| Ziad Khader | 2945 West State Road 32, Westfield, Indiana 46074 | 29-09-05-000-008.000-014 |
| Ziad Khader | 2015 Land Rover | SALWR2TF5FA606305 |

4)    To preserve all business, financial, and accounting records, including bank records, that detail each of the defendants' business operation and disposition of any payment that directly or indirectly arose from the payment of money to the defendants on behalf of all health care benefit programs, including those administered by Express Scripts, AccessHealth, and CVS Caremark;

5)    To preserve all billing and medical records which relate to each of the defendants' business operations and/or to services for which claims were submitted to be paid by all health care benefit programs, including those administered by Express Scripts, AccessHealth, CVS Caremark;

6)    To provide an accounting of all assets, within seven calendar days;

7)    To complete a Financial Disclosure Statement form provided each of the defendants by the United States within seven calendar days; and

8)    For such other and further relief as the Court shall deem just and proper.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney


By: _Debra Richards_
Debra G. Richards
Assistant United States Attorney
Office of the United States Attorney
10 W. Market St., Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333
Fax: (317) 226-5027
Debra.richards@usdoj.gov